# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville April 23, 2013

## HENRY ALFRED HONEA v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County**
**No. 38,830   L. Craig Johnson, Judge**

---

**No.  M2012-01812-CCA-R3-PC     Filed October 24, 2013**

---

The Petitioner, Henry Alfred Honea, appeals the Coffee County Circuit Court's denial of his petition for post-conviction relief from his 2006 convictions for first degree murder, especially aggravated robbery, especially aggravated kidnapping, aggravated burglary, evading arrest, and being a felon in possession of a handgun, and his effective sentence of life without parole plus 153 years.  The Petitioner contends that he received the ineffective assistance of counsel.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Eric J. Burch, Manchester, Tennessee, for the appellant, Henry Alfred Honea.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; and C. Michael Layne, District Attorney General, for the appellee, State of Tennessee.

## OPINION

According to this court's opinion in the Petitioner's appeal of his convictions, the evidence at the Petitioner's trial showed that:

> The Defendant's convictions arose from the kidnapping and murder of 92-year-old Flossie Barr and the burglary of her home.  At the trial, Detective Frank Watkins of the Coffee County Sheriff's Department testified that on May 22, 2004, he and other officers were searching for the Defendant due to the Defendant's outstanding warrants.  He said that the sheriff's department received a tip by telephone around 7:10 p.m. that the Defendant was driving

a small black car with gray on the bottom toward Tullahoma. He said that he heard radio reports of other officers having seen the Defendant and that he and other officers searched in various locations. He said that he was with Chief Holt and Investigator Campbell when they passed the church the Defendant's father pastored and that he saw a car parked at the side of the church. He said that as he drove toward the car, another car came from behind the church and drove by him. He said that as the car passed, he noticed that the driver looked like the Defendant. He said that he was able to see the car as it passed the other officers and that it matched the description they had been given. He said that the Defendant drove slowly through the parking lot and that Investigator Campbell yelled that the person was the Defendant. He said that he and Chief Holt followed the Defendant onto South Roosevelt Street and that when they activated their blue lights and sirens, the Defendant accelerated and tried to flee. He said the Defendant ran a stop sign, made a hard turn, and ran another stop sign while he and Chief Holt pursued. He said that the Defendant failed to negotiate a curve and ran into a driveway and through a yard, barely missing a house. He stated that the Defendant jumped out of the moving car before it hit a fence and fled on foot. He said that Chief Holt, Investigator Campbell, and he chased the Defendant on foot and that Investigator Campbell ordered the Defendant to stop and stated that they were from the sheriff's office. He said that as he came into a wooded area, he saw the light of Investigator Campbell's flashlight and heard Investigator Campbell yelling for the Defendant "to put it down." He said that as he ran back toward the patrol cars to keep the Defendant from stealing one of the cars, the Defendant came out of the woods holding a pistol. He said that the Defendant made a motion toward Investigator Campbell and that he fired his gun twice because he feared the Defendant would shoot Investigator Campbell. He said the Defendant ran but then fell to the ground. He said he saw a pistol on the ground a few feet from the Defendant's head when the Defendant was struggling not to be handcuffed by Chief Holt and Investigator Campbell. He said the Defendant was shot in the right knee.

Detective Watkins testified that he learned after the Defendant's arrest that the Defendant was driving a car registered to the victim. He identified as an exhibit a weapon that he said was the one the Defendant carried. He identified photographs of the church where the officers first saw the Defendant, located at 1100 East Lincoln Street, and the victim's house, located at 1107 East Lincoln Street. While identifying photographs of the area covered during the chase, he said the Defendant put third persons at risk of death or injury. He said that the Defendant nearly struck two occupied homes

and that he and Chief Holt nearly hit a house while chasing the Defendant. He said that a case of Budweiser beer, bottles, and personal belongings were found inside the car the Defendant drove.

Detective Watkins testified that he had been to the victim's home several times before May 22. He said he and other law enforcement officers had been there to reassure her that they would help her with things occurring at her home, which were unspecified at the trial. He said that the victim always invited him inside her home and that her home and car were "pretty neat and tidy" and that her car was always washed. He saw the victim take her car keys from her purse.

Detective Watkins testified that the victim was not at her home on the evening of May 22. He said the police checked with the victim's relatives, who said they had not spoken with or seen the victim in a few days. He said that the search for the victim extended outside Coffee County and that they focused on the area around "the pumping station," which the Defendant was known to frequent. He said that on May 26, a body was found at the pumping station.

Detective Watkins testified that he went to the pumping station and saw a female body. He said it was near power lines in an open area that had been used for four-wheeling. He said the body was covered with cut saplings. He said that the distance between the area where the body was found and the area where the victim's home and the church were located was between 7.2 and 7.4 miles, depending on the route traveled, and that it would take about fifteen minutes to travel the distance at normal driving speeds.

Detective Watkins identified a nine millimeter Taurus handgun as the one the Defendant had on May 22. He said the weapon did not have a clip in it when it was recovered but that a magazine and cartridges were found in the area of the foot pursuit of the Defendant. He also identified a bag of marijuana that the Defendant possessed when arrested.

Detective Watkins testified that there were several differences between the car when it was at the victim's house and when the Defendant was arrested. He said it had been a "tannish-brown" color but that it was spray painted flat black "more or less in a homemade fashion." He said that the victim kept the car's interior "neat" but that it was in disarray on May 22.

On cross-examination, Detective Watkins admitted that the police looked for the Defendant for about two weeks for outstanding warrants unrelated to the victim's murder. He said that after receiving a "no contact" report about the victim, the Tullahoma police went to her home earlier in the day of May 22 and found her door open. He acknowledged that his car did not have a working siren on May 22. He said that when the Defendant came out of the woods during the foot pursuit, the Defendant was walking, not running. He acknowledged that the Defendant never fired his gun during the chase and arrest. He said that he did not personally recover the Defendant's gun but that he was able to identify it because he wrote down the serial number.

Detective Watkins testified that the victim called the police frequently and that he had been to her home approximately fifty to sixty times over a three to four-month period. He said she was concerned that people would break into her home and steal from her. He acknowledged that she was paranoid. He said that she was concerned about her neighbors but that she never mentioned the Defendant or any family members.

Bill Pamplin testified that the victim was his maternal aunt. He said that she was a ninety-two-year-old widow and that she had health problems. He said that he was her "go-to boy" before her death, that he tried to see or talk to her weekly, and that he took her to appointments and on errands. He said the victim was neat and orderly with her home and her car. He said that she would not loan her car to others and that she kept her car keys in her purse. He said that she kept her purse in her bedroom when it was not with her and that she kept the purses she was not using in her bedroom closet. He said he did not remember the victim ever leaving her keys on the coffee table. He identified a photograph depicting the victim's keys and said that the safety pin on one of the keys was the victim's "trademark" because she liked safety pins.

Mr. Pamplin testified that the victim was concerned about her safety. He said she kept her blinds closed after dark, locked her doors, and stuck screwdrivers in her doors because she thought they provided extra protection. He said that she made visitors identify themselves before she let them into her house. He said the victim would not have allowed anyone to spray paint her car.

On cross-examination, Mr. Pamplin acknowledged that he last saw the victim on May 9, 2004. He said that the victim appointed him executor in her will in 2003 and that she had seven grandchildren, all of whom lived in the

Nashville area. He admitted that the victim made statements to him about her belief her grandson Joe was stealing money from her and that it was after this that he was appointed executor. He said he did not know whether Joe had the opportunity to steal money from the victim. He admitted that the victim was paranoid about her neighbors stealing her food but said she never mentioned anyone by name. He acknowledged that the victim never expressed concerns about the Defendant.

Judy Grealis testified that she was retired from Contact Lifeline, a service that called elderly or disabled people to provide friendship and reassurance. She said that Contact Lifeline called the victim every day and that she was one of the people who called the victim. She said she had been to the victim's home to take photographs one or two weeks before the victim's disappearance. She said that Contact Lifeline kept photographs of the people called in order for its volunteers to know the people they were calling. She said she was very impressed by the victim's perfect housekeeping and landscaping. She said the victim's car looked "fine" but admitted she did not really notice it. She identified a photograph she took of the victim a week or two before the victim's disappearance. She said that the victim's home was spotless in the photograph and that there were no keys on the coffee table in the photograph. She identified a photograph of the victim's yard, which she said was in excellent condition every time she saw it. She identified another photograph depicting the flowers in the victim's yard and part of the victim's car.

Ms. Grealis testified that she last spoke with the victim on May 21, 2004, at about 3:30 p.m. She said that she asked the victim if she could visit the next day to show her a photograph collage but that the victim said she did not feel well and did not want her to visit. She said that she tried to reach the victim on May 22 at noon but that the victim did not answer her telephone. She said that another call from Contact Lifeline was placed at 1:00 p.m. but that the victim did not answer. She said she went to the victim's home around 4:00 p.m. and saw that the padlock the victim kept on her front door was missing, that a window was open, and that the victim's car was not there. She said that she left because she felt uneasy and that she called Contact Lifeline to have a backup person check on the victim.

On cross-examination, Ms. Grealis acknowledged that although she drove by the victim's home about five times in the year before the victim's death, she only visited inside the victim's home once. She also admitted she

was not always the person from Contact Lifeline who called the victim. She said that about a month before the victim disappeared, the victim expressed her concern that someone was stealing her food. She acknowledged that she was not concerned the first time the victim did not answer her telephone on May 22 because the victim was sometimes away from home.

Sue Meks testified that she was the manager of Favorite Market on May 22, 2004. She said the Defendant came to the store around 2:00 or 2:30 a.m. and bought a twelve-pack of Budweiser for "$10 and some change." She described the Defendant as very calm. She said that as the Defendant drove away, she saw he was in a brown Ford or Mercury with metal racks on the back. She identified a photograph of the market and a cash register receipt for a twelve-pack of Budweiser for $10.34. She noted the time and date on the receipt as 2:14 a.m. on May 22, 2004. She identified a videotape from the market's cameras, which she said showed that the Defendant came to the store, bought beer, and left. She noted that the tape reflected a time of 2:16 a.m. when the Defendant took the beer from the cooler. The tape was played for the jury. Ms. Meks testified that she watched to be sure the Defendant was gone and then called the Communications Center and reported that the Defendant just left the store. She said she waited because, "I didn't want him to know that I knew anything."

On cross-examination, Ms. Meks acknowledged that the Defendant did not cause a disturbance in the store. She said he did not have any difficulty finding the beer or paying for it. She admitted he did not have noticable stains on his clothes. She acknowledged on redirect examination that she told the TBI in a previous statement that the Defendant looked intoxicated, tired, and unshaven. She said on recross-examination that the Defendant was uneasy, which made her uneasy, but that she called the police based on information she knew, not the Defendant's mannerism.

Tullahoma Police Officer Rana Pawlowski testified that before the victim's death, she responded to the victim's 9-1-1 calls reporting that someone was breaking into the victim's home. She said that after the victim called 9-1-1 several times, she trimmed the bushes near the victim's windows to prevent them from scraping the windows and frightening the victim. She said the victim kept a clean, organized home.

Officer Pawlowski testified that on May 22, 2004, she was dispatched by the Communications Center to check on the victim. She said that when she

arrived at the victim's house about 8:40 p.m., the victim's car was not there. She said this was strange because the victim did not like to drive at night. She said the door was open and missing the padlock. She said that after Officer Blackburn came to assist her, they went into the victim's home and noticed the rug at the front door "wadded up," which she said was unusual given the victim's orderly nature. She said the toilet seat was up and there was urine but no tissue in the commode, which made her think a man had been there. She said that the victim's bedcovers were in disarray, that there were stains on the bedspread that looked like blood, and that the victim's purses were scattered about the room. She said that she notified the Communications Center and left the victim's home, locked the door as best she could, and began patrolling for the victim's car.

Officer Pawlowski testified that ten or fifteen minutes later, she responded to a call for assistance from other officers who were chasing the victim's car. She said that when she saw the victim's car, it appeared to have hit a fence on property behind a curve in the road. She said she heard a couple of shots and saw the Defendant running around the side of a house a few minutes later. She said she ran parallel to the Defendant for twenty to twenty-five yards until he threw the gun and fell, after which he was captured. She said she stood over the gun until the investigators arrived to collect it.

On cross-examination, Officer Pawlowski testified that the victim was paranoid about her neighbors, believing they were stealing food and cooking in her house when she was not there. She said the victim never identified anyone by name and never complained about the Defendant. Officer Pawlowski acknowledged that she went to the victim's home ten to thirty times in the year before the victim's disappearance, usually because the victim thought someone was trying to break in to her home. She admitted she never found any evidence of an attempted entry.

Officer Pawlowski admitted that when the Defendant threw the gun and fell, the gun was not within his reach. She said that when she looked at the gun on the ground, it did not appear to have a magazine in it.

District Attorney's Investigator Billy Cook testified that he responded to the scene where the Defendant was shot and taken into custody. He said he took photographs, investigated the scene, and went to the victim's home. He said he knew something was wrong because the victim was missing and her car was spray painted.

Investigator Cook testified that he and Tullahoma Police Detective Ron Cunningham went to the hospital to question the Defendant about the victim's disappearance. He said the Defendant claimed that he helped the victim, whom he called "Granny," mow her yard on May 21, 2004. He said the Defendant stated that the victim allowed him to borrow her car and that she did not care that he spray painted it. He said the Defendant admitted being in the victim's home and sitting on the side of her bed while talking to her. He said the Defendant claimed to have last seen the victim at 3:00 or 4:00 p.m. on May 22. He said the Defendant denied killing the victim or hiding her body.

Investigator Cook testified that after interviewing the Defendant, he went to the victim's house and searched inside with other officers. He said that the rug by the front door was out of place, that the victim's bed was in disarray, that her purses were strewn across the bed, and that the purse's contents had been emptied onto the bed. He said that there was no evidence indicating the victim was killed in her home and that they secured the home in order to focus on searching for the victim's body elsewhere. He said the search continued until the early morning hours.

Investigator Cook testified that on May 23, 2004, he directed the crime scene investigation at the victim's house while other officers continued looking for the victim. He identified a diagram and photographs of the victim's home and testified about the configuration of the home. He said the victim's home and yard appeared to have been well maintained and that the yard appeared to have been recently mown.

Investigator Cook testified that a rag was left in the bathroom sink and that the victim's denture holder contained only her lower dentures. He said the stain on the victim's bedspread was later determined to have likely been from the victim's unhealed leg wound. He said that a garbage can was underneath a living room window and that the window's latch was broken and its screen cut. He said that inside the home, a sofa was underneath the window and that it appeared to have been stepped on because it had dirty spots and an indentation.

Investigator Cook testified that they did not find the victim despite extensive searches on May 24 and 25, 2004, and that he and TBI Agent Kendall Barham questioned the Defendant on May 25. He said the Defendant told them that he cut the screen of the victim's window and climbed in across the couch, that he found her keys on the coffee table, and that he left through

the front door. He said the Defendant claimed not to know whether the victim was home. He said the Defendant recounted that he bought spray paint in Murfreesboro, that he painted the car, and that he searched for his father to gain permission to sleep in the church. He said that he implored the Defendant to do the right thing in order for the victim to have a proper burial, that the Defendant asked to have a cigarette first, and that the Defendant said, "Y'all [will] never be able to find her. I'll have to draw you a map." He said that the Defendant promised to draw the map if they would return the following day and requested the death penalty rather than spending the rest of his life in prison. He said he and Agent Barham signed a statement that they would recommend the death penalty to the district attorney, which they gave to the Defendant. He said that the Defendant refused to talk further about the location of the victim's body and that the Defendant said he wanted to talk to his lawyer. He said that the Defendant said he still wanted to talk to them the next day but that when they returned on May 26, the Defendant did not have a map for them. He said he later returned to the victim's home and found its condition consistent with the Defendant's account of cutting the screen and climbing in through the window.

Investigator Cook testified that while he and Agent Barham were at the victim's home on May 26, 2004, they received information that a female body had been found. He said they went to the scene, which was in a remote area near the pumping station and Normandy Lake, and saw a decomposing body covered with freshly cut branches and saplings.

Investigator Cook testified that he and Agent Barham talked to the Defendant on August 16, 2004, and that the Defendant denied killing the victim. He said the Defendant claimed that he and his wife met David Loffman at the pumping station and that he gave Mr. Loffman his gun because Mr. Loffman was going to pay him for it. He said the Defendant claimed that he returned to the pumping station on May 21 at 9:00 p.m. and that he met with Mr. Loffman, another man, and a woman with long, dark hair. He said that the Defendant stated that Mr. Loffman told him to return in an hour and a half and that the Defendant claimed he found a brown paper bag with the gun and $100 inside when he returned. He said the Defendant reported that he knew Mr. Loffman lived in a trailer across from the Defendant's father's church. He said the Defendant admitting knowing that the trailer had been the victim's but that the Defendant claimed to think the victim had died long ago. He said the Defendant reported that he decided to break into the trailer and steal the car because Mr. Loffman still owed him money. He said the Defendant claimed

that he rode a bike from his father's house to the church, that he left the bike in a shower stall at the church, and that he entered the victim's home by cutting the window screen and climbing through the window. He said that the Defendant reported finding the victim's car keys on an end table and also finding the bag with the gun. He said the Defendant claimed he was scared by a noise from the back of the house and left. He said the Defendant identified David Loffman as his wife's boyfriend. Investigator Cook identified a photograph exhibit of the keys that were in the victim's wrecked car.

On cross-examination, Investigator Cook acknowledged that the Defendant admitted breaking into the victim's home through the window, taking her car, and spray painting the car. He admitted the Defendant talked to him voluntarily on August 16, 2004, even though the Defendant stated he wanted to speak to his lawyer on May 25. He said that in his opinion, the Defendant fabricated the story about meeting with someone and selling a gun for $100. He said that the Defendant told "bits and pieces of the truth" but that he did not believe the Defendant's statements overall. He admitted he did not investigate the parts of the Defendant's statements that he did not believe. He said that he thought the Defendant's claim about David Loffman referred to one of the victim's grandsons but that he did not believe the Defendant really knew the grandson's name.

Investigator Cook testified that a laboratory analysis was performed on a shell casing found near the victim's body and that the casing matched the handgun the Defendant had when he was arrested. He acknowledged that slugs of several other calibers were found near the body. He said an upper denture was also recovered in the area.

Special Agent Kendall Barham of the TBI testified that he went to the victim's house at least three times during the course of his investigation. He said there was a denture holder and a set of lower dentures in the victim's bathroom. He said a set of upper dentures was found near the victim's body.

Agent Barham testified about the Defendant's statement on May 25, 2004. He said the Defendant admitted cutting a window screen at the victim's house and climbing inside the window. Agent Barham said the Defendant took the car keys from a coffee table and left through the front door. He said the Defendant admitting going to Murfreesboro in the victim's car, buying spray paint, painting the car, and going to an area near Tims Ford Lake. He said that when Investigator Cook mentioned giving the victim a decent burial,

-10-

the Defendant became complacent and asked to have a cigarette before he told them what happened. He said the Defendant claimed that they would never find the victim and that he would have to draw them a map. He said the Defendant stated that he wanted to be sentenced to the death penalty. He said the Defendant would not identify the location of the victim's body and eventually requested an attorney, which ended the interview. Agent Barham said that he and Investigator Cook returned the next day to get the map the Defendant promised to draw but that the Defendant did not provide it.

Investigator Barham testified that Agent Cook's written summary of the Defendant's August 16 interview was accurate. He said that the interview took place while he was driving on the interstate and that he was not able to pay close attention or make notes.

On cross-examination, Investigator Barham testified that after the Defendant admitted cutting the window screen, he went to the victim's house and confirmed that the screen was cut. He said that he attempted to collect fingerprint evidence but that he was not able to get a print of sufficient quality for analysis. He said that he contacted the manager of the store where the Defendant claimed to have purchased spray paint, and that the manager told him he did not have a store video. He said that the manager told him he would contact him if he found a cash register receipt for the paint but that he never heard from the manager. He acknowledged that some of the Defendant's statements were true.

Christopher Harrell testified that he lived next door to the victim in May 2004 and that he assisted in the rescue squad's search for the victim near the pumping station. He said that a few days later, he went to look for the victim on his own. He said he was riding his four-wheeler in the Normandy Lake area and smelled an odor of decay. He said he looked for the source of the smell and found the victim's body covered by small tree limbs in woods near "briary grass." He said that he called his grandmother to report his findings, that she called the authorities, and that he went to the pumping station entrance to wait for their arrival. He denied touching the body or the ground near it. On cross-examination, Mr. Harrell admitted he never saw the Defendant near where he found the victim's body.

TBI Special Agent Sandra Poltorak testified that she was a forensic scientist supervisor and a member of the Violent Crime Response Team that processed the scene where the victim's body was found. She identified

photographs taken by the team and a diagram she drew. She said the victim's body was not intact and appeared to have been damaged by animals and insects. She said they collected two cartridge casings, one of which was underneath the body. She said they also collected half of a set of dentures and clothing. She said that based upon her experience and the extent of the decomposition of the victim's body, it was her opinion that the victim was not killed the day she was found. She acknowledged that it was hot on May 26 and that decomposition accelerated at high temperatures.

On cross-examination, Agent Poltorak acknowledged that the beer cans the team collected did not have any identifiable fingerprints. She said that when she arrived at the scene, she was informed the body was female and that the team speculated that it was the victim. She said the leaves on the branches covering the victim's body were still green. She acknowledged that no hair, fibers, fingerprints, or DNA were collected at the scene that would link the Defendant to it.

Dr. John Patsimas testified that he was the victim's treating physician. He said that he saw her as a patient frequently, that they were very close, and that she "adopted" him as a grandson. He said that given her age, she was in good health. He could not recall whether she wore dentures. He identified x-ray films he took of her knee in 2000 that he said the medical examiner requested to assist in identification of her body.

Dr. Amy McMaster testified as an expert witness in forensic pathology. She performed the victim's autopsy on May 27, 2004. She said that the body was in an advanced state of decomposition and that there was skeletonization, or exposure of the bone. She said she requested Dr. Hugh Berryman, an anthropologist, to assist her. She said the body was identified as the victim based upon comparisons with existing x-rays of her knee.

Dr. McMaster testified that in her report, she listed the victim's date of death as May 26, 2004, because in Tennessee the legal date of death was determined by when a person is pronounced or found dead, rather than by the date the person actually died. She said that given the state of decomposition, the victim did not actually die on May 26. She said the manner of death was homicide and the cause of death was gunshot wounds. She said there were at least two gunshot wounds, one on the left side that injured the victim's left collarbone and left first rib, and one on the right side that injured the victim's right fifth rib and right shoulder blade. She said that the gunshot to the left side traveled from back to front and that the one on the right side traveled from

-12-

front to back. She said that there were fractures of the bones of the spine and ribs but that she was unable to determine whether they occurred before or after the victim's death. She said that it was likely that major organs were damaged by the gunshots and that if this happened, the victim would have been conscious for about thirty seconds and would have died in less than five minutes. She said the only clothing on the victim's body was a pajama-type top. She said that there were holes in the top but that she was unable to determine what caused them. She said, however, that the holes corresponded with the same areas of the victim's body as the gunshot wounds. She said that parts of the body could have become separated either from animal activity or decomposition of ligaments and tissue.

Dr. McMaster testified that in her opinion, the victim died on the earlier end of the five-day window between the victim's disappearance on May 21 and her recovery on May 26, 2004. She said that estimating the time of death is imprecise. She said that she would not expect to see the amount of decomposition and skeletonization present within a day or two of death and that it was more likely the victim died four or five days before her body was found.

On cross-examination, Dr. McMaster acknowledged that she was unaware of any DNA identification of the victim. She admitted the autopsy order listed the victim's name as the probable identification of the body. She acknowledged that she would have inquired about the last time the suspected victim was seen alive.

Special Agent Steve Scott of the TBI testified as an expert in ballistics. He said that in connection with this case, he examined a Taurus Model PT92 nine-millimeter handgun, cartridge cases, and fired bullets, which he identified as items in evidence. He said the unfired ammunition he received was consistent with the type that would be fired from the handgun. He said that based upon his examination, he determined that the two fired cartridge cases recovered from the crime scene were fired from the Taurus nine-millimeter handgun. He said that he also examined three nine-millimeter projectiles recovered from the scene and that it was possible one of them was fired from the handgun, although he could not say so conclusively.

The defense did not offer proof. The jury found the Defendant guilty of first degree premeditated murder, first degree felony murder, especially aggravated robbery, especially aggravated kidnapping, aggravated burglary,

-13-

evading arrest, and unlawfully possessing a handgun. The trial court then conducted the sentencing phase of the trial for the murder convictions, in which the State sought the penalty of life without parole based upon aggravating factors that (1) the victim was more than seventy years old, and (2) the Defendant had one or more prior violent felony convictions.

The State introduced certified copies of judgments reflecting the Defendant's prior convictions for four counts of kidnapping, aggravated burglary, burglary, temporary taking of a motor vehicle, grand larceny, two counts of malicious mischief, concealing stolen property valued at less than $200, and felony escape.

Investigator Billy Cook testified that he was involved in the investigation of the Defendant's four prior kidnapping convictions. He said the crimes occurred on October 17, 1998, and involved the kidnapping of four teenage boys. He said his investigation revealed: The boys threw eggs at the Defendant's fence and mailbox and "rolled a yard" of someone else. After visiting in someone's home, the boys returned to the car in which they had been riding and found the Defendant standing next to it. The Defendant yelled at and slapped one of the boys and pushed his way into the back seat while holding a bag. The Defendant insisted that the boys take him into the country, despite the driver's protest. The driver eventually did so, and when they reached a lake, the Defendant pointed a gun at one of the boys and stated that he could kill them all. One of the boys said he was going to leave, but the Defendant told him, "You ain't going nowhere." The Defendant took the car keys. They were at the lake about forty-five minutes to an hour before the Defendant drove them around on back roads and insisted that they drink alcohol. The Defendant went to a house he said was his brother's and then took the boys to a tobacco field, where they stayed for about two hours. One of the boys said he wanted to go home and asked to drive, but the Defendant did not yield the keys. The boys ran to a house when the Defendant fell asleep or lost consciousness. On cross-examination, Investigator Cook acknowledged that the Defendant was convicted of the kidnapping charges based upon his guilty pleas, not a trial.

The defense called Becky Cook, the Defendant's sister, who testified that the Defendant did carpentry work when he was not in jail. She said he had a long-standing drug and alcohol problem. She said her family loved and supported him.

The jury found the existence of both aggravating factors and returned a verdict that the Defendant should be confined for life without parole. The jury also found that the Defendant had a prior felony conviction of kidnapping.

The trial court conducted a sentencing hearing on the other convictions. *State v. Henry Alfred Honea*, No. M2009-01500-CCA-R3-CD, slip op. at 1-13 (Tenn. Crim. App. Jan. 28, 2011), *perm. app. denied* (Tenn. May 31, 2011).

The Petitioner filed the present post-conviction action alleging the ineffective assistance of counsel regarding his two trial attorneys. As relevant to this appeal, the Petitioner alleged that counsel were ineffective for failing to object to a Tennessee Bureau of Investigation (TBI) agent's non-expert testimony about the rate of decomposition of the victim's body, failing to request a jury instruction on alibi, failing to subpoena potential defense witnesses, and failing to request a mistrial after the jury was informed of the Petitioner's pending charges. After counsel was appointed and the petition was amended, the trial court conducted a hearing on the Petitioner's allegations.

At the hearing, the trial transcript was received as an exhibit. Co-counsel testified that he assisted lead counsel in the Petitioner's trial. He said that he began working on the case after counsel had been appointed but did not recall how long the case was pending before he began assisting with the defense. He agreed that TBI Agent Sandy Poltorak testified that the victim's body was in an advanced stage of decomposition indicating that she had been in the location where she was found for more than two or three days. He did not remember if Agent Poltorak was qualified as an expert witness or if he objected to her testimony but said "that was a very critical piece" because the Petitioner had asked counsel to file motions to dismiss because the Petitioner thought he had been in custody when the offense occurred. He agreed that Dr. Amy McMaster, the forensic pathologist who performed the autopsy, had not yet testified when Agent Poltorak testified and that it might seem in hindsight that Agent Poltorak's testimony bolstered evidence that the victim's body had been where it was found for longer than two days. He said the Petitioner had been in jail for two days before the victim's body was found. He said he had trouble getting the Petitioner to understand that the time of death listed on the victim's death certificate referred to the time the victim's body was found, not the time the victim died.

Co-counsel testified that no defense motion for an alibi instruction was made, even though Dr. McMaster's testimony did not foreclose the possibility that the victim's body had been in the location where it was found for two days. He said it was possible, though, that a question of an alibi was fairly raised by his cross-examination of Dr. McMaster.

-15-

Co-counsel testified that he did not interview Iris Crowfoot or Barbara Lewter but that counsel did and that "Mr. Conn" may have been present, as well. He said that when the District Attorney General's Investigator, Billy Cook, testified, information regarding the Petitioner's pending rape charge was displayed on a screen. He said that he or counsel objected. He did not recall how long the information was displayed but thought it was brief. He acknowledged that the information could have been prejudicial if a juror saw it. He said that a jury-out hearing was held but that they did not a request a mistrial on this basis. He did not recall if the Petitioner advised him that he did not have pending rape charges.

On cross-examination, co-counsel agreed that it was a matter of common sense that a body that was extremely decomposed would have been deteriorating for "a matter of days." He agreed that Dr. McMaster testified as an expert that this was correct. He thought his cross-examination of Dr. McMaster was very effective because it showed that she could not determine an exact time of death due to the advanced decomposition. He thought he argued that this created reasonable doubt.

Co-counsel agreed that this court said in the appeal of the Petitioner's convictions that no evidentiary basis existed for an alibi instruction. He recalled that the Petitioner had a handgun when he was taken into custody on May 22, 2004, and that the TBI laboratory later determined that the handgun was the murder weapon. He agreed it was logical to conclude that the victim was killed before the Petitioner was arrested because the handgun was in police possession after the Petitioner's arrest. He agreed that requesting an alibi instruction would have been "frivolous." He said he was told that Ms. Crowfoot and Ms. Lewter did not have information that benefitted the defense. He agreed that despite information about the Petitioner's pending charges having been displayed on the screen, there had already been evidence that the police were looking for the Petitioner on the day of his arrest due to outstanding charges. He did not know if any jurors saw the information on the screen. He said a curative instruction was given. He did not think the information on the screen warranted a motion for a mistrial.

Co-counsel testified that he and counsel did the best they could with the Petitioner's case and that he thought their efforts turned out better than he envisioned. He agreed that the proof against the Petitioner was overwhelming and that the Petitioner admitted cutting the victim's window screen, climbing into her house, taking the victim's keys and car, and painting the car. He agreed that within hours or a day, the Petitioner was found in possession of the murder weapon.

On redirect examination, co-counsel testified that he cross-examined Dr. McMaster about the time of death in order to "poke holes" in the strong case the State had against the Petitioner. He said that if he were trying the case again, he might consider requesting an alibi

instruction. He did not recall if he considered it during the Petitioner's trial. He said that he talked to the Petitioner on multiple occasions about the strength of the State's evidence and that the Petitioner insisted "he did not do this."

Iris Crowfoot testified that the victim had lived across the street from her for about ten years. She said that counsel interviewed her and that she "gave him some leads" and a written statement. She said counsel stated that he wanted to create confusion, but later she said she interpreted this to mean that counsel thought she was confused. She said that she told counsel about Meals on Wheels and that someone had gone to the victim's door and claimed to be Clarence Loffman, although the person was David Loffman. She said the Loffmans were the victim's grandsons. When asked if the victim was afraid of her grandsons, Ms. Crowfoot said that most of the time, the victim talked about "Joel." She said that she knew the victim was afraid of at least two of her three grandsons and that she probably told counsel this. She said the victim was mad at Joe Loffman because he had her power of attorney and took $10,000 to buy a car against her wishes. She thought she told counsel about this. She said that one or two days before the victim's disappearance, she saw a man "cutting through" the victim's property and that she told the victim what she had seen. She said the victim told her that people had stolen from her house. She thought she told counsel about this. She said that no one, including police officers, ever contacted her after her conversation with counsel. She said she was not subpoenaed and did not attend or testify at the Petitioner's trial.

Post-conviction counsel stated that he attempted to subpoena Barbara Lewter. He said that Lee Nettles attempted to serve the subpoena but that Mr. Nettles learned that Ms. Lewter had died.

Counsel testified that he was appointed to represent the Petitioner after the indictment was returned. He said he knew the Petitioner because the Petitioner had done work on his property years earlier. He said that he interviewed Ms. Crowfoot once and that he took the Petitioner's sister with him because she knew Ms. Crowfoot. He said he interviewed her shortly after he was appointed because she had written supportive letters to the Petitioner that contained negative allegations about the Coffee County judicial system.

Counsel testified that Ms. Crowfoot was "very, very paranoid" and had other residents of her house talk to him before she came outside and talked to him in the presence of the other people. He said that Ms. Crowfoot told him about problems with Joe Loffman and that although he did not talk to Mr. Loffman, he "checked into it." He said he questioned the victim's nephew, who did not have specifics about any problems between the victim and a grandson. He said he checked with the police about past calls to the victim's house. He said there were calls about the victim's nephew and the victim's hearing noises. He noted that

-17-

the victim was ninety-four years old and lived alone. He said the police had no knowledge of anything related to the victim's grandson. He did not remember if someone had the victim's power of attorney. He thought Ms. Crowfoot told him about the allegation that someone stole money from the victim but said she did not know any factual information. He said they "tried to put the blame on the grandson some way, but it didn't work." He did not remember Ms. Crowfoot saying that she saw someone go through the victim's yard.

Counsel testified that he did not call Ms. Crowfoot as a witness because he did not think she knew anything about the case. He said that he talked to the Petitioner about it and that it was not entirely his decision not to call her as a witness. He said they discussed "the other lady," as well. He did not remember the Petitioner's filing a motion to have Ms. Crowfoot subpoenaed. He said that after he talked to the Petitioner, the Petitioner agreed with him about not calling Ms. Crowfoot as a witness.

Counsel testified that he agreed with co-counsel that the evidence against the Petitioner was overwhelming. Regarding Agent Poltorak's testimony, counsel said a layperson could view a decomposing body and testify about the amount of decomposition. He recalled Agent Poltorak testified that animals had fed on the body. He said a layperson could testify to the deterioration of a body but not scientifically to how long it had been there. He thought co-counsel did a good job cross-examining Dr. McMaster. He agreed that Dr. McMaster stated the body could have been at the location it was found for three to five days but that on cross-examination, she said she thought the body had been there for more than two days. He agreed that if the body had been there for only two days, the Petitioner would have been in custody. He said, though, that at the time, he did not think an alibi instruction was appropriate.

Counsel testified that the screen on which the Petitioner's pending charge was displayed was a "portable-type" screen and that the information was only visible briefly. He said that he objected as soon as he saw it and that it was turned off. He was aware the Petitioner had a rape charge at some point but did not recall the nature of the charges shown on the screen. He said he did not request a mistrial because he thought the judge's curative instruction adequately addressed the situation. He said he did not want to create greater emphasis, did not know if any of the jurors saw or recognized the information, and did not want to ask them.

On cross-examination, counsel agreed that based upon the evidence, it was logical that the murder occurred before the Petitioner's arrest. He agreed that this court said in the appeal of the Petitioner's convictions that an alibi instruction was not supported by the evidence. He said that he, co-counsel, his investigator Dale Conn, and the rest of his staff worked diligently on the Petitioner's case. He said they did all they could with the evidence

they had. He said that he and the Petitioner had a good relationship and that although the Petitioner did not like some things he did, they never fought. He said he "begged" the Petitioner to accept a plea offer. He said that he had the Petitioner's sister, his mother, and a friend talk to the Petitioner about a plea agreement but that the Petitioner was adamant he was not guilty.

In a written order, the trial court denied post-conviction relief. This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

# I

The Petitioner contends that counsel provided ineffective assistance by failing to object to Agent Poltorak's testimony about the decomposition of the victim's body, despite the fact that she was not qualified as an expert witness. The State contends that counsel were not deficient in failing to object and that any purported deficiency did not affect the outcome of the Petitioner's trial. We conclude that the Petitioner is not entitled to relief.

As we noted, Agent Poltorak, a forensic scientist, testified at the trial that she processed the scene where the victim's body was found. She stated that the victim's body appeared to have been damaged by animals and insects. Based upon her experience and the extent of the decomposition of the victim's body, it was her opinion that the victim was not killed the day she was found. She acknowledged that it was hot on May 26, 2004, and that decomposition accelerated at high temperatures. We note that Agent Poltorak was asked if she was qualified to testify as an expert about the time of death and that she acknowledged she was not. When asked if warm temperatures would cause the body to decompose faster, she said, "Once again, *I'm not an anthropologist or a medical examiner*, but the best of my knowledge, yes, that would accelerate it." (Emphasis added.)

On appeal, the Petitioner raised an issue regarding the admission of Agent Poltorak's testimony. Because the issue had not been raised in the trial court, this court considered the issue as a matter of plain error and concluded that none existed. In reaching this conclusion, this court noted, "The record reflects that Agent Poltorak's testimony was consistent with Dr. McMaster's expert testimony. Dr. McMaster testified in detail about the victim's time of death and state of decomposition." *Henry Alfred Honea*, slip op. at 17-18.

In denying post-conviction relief, the trial court stated:

> The court finds that . . . the qualified expert, Dr. Amy McMaster, gave authoritative testimony on the subject. Although it could be considered cumulative, Agent Poltorak's testimony was not given as an expert, but merely what a lay person would have said in response to the questions asked. As the Court recalls, all of the evidence showed that the victim's body was in no shape to support the theory that she had died just a couple of days before discovery. Therefore, the Court finds that this ground is unsupportable.

The Petitioner argues that the date of the victim's death was a critical issue. He was arrested on May 22, and the victim's body was not found until May 26. The evidence showed, though, that the Petitioner possessed the murder weapon when he was arrested. When the Petitioner was interviewed, he told a police investigator that on May 21, he met

with David Loffman and two other individuals at the pumping station where the victim's body was found. He said he sold his gun to David Loffman with an agreement to return in one and one-half hours for payment. The Petitioner claimed that he gave Mr. Loffman the gun and that when he returned for payment, he found the gun and $100 in a bag and kept both. The Petitioner claimed he thought the victim's trailer was Mr. Loffman's and decided to break into it and steal the car because Mr. Loffman owed him money.

We conclude that although Agent Poltorak may have ventured into expert opinion testimony, she acknowledged she was not an expert capable of determining the time of death, and her opinion was limited to stating that she thought it was more than a day before the body was found. Given these circumstances, counsel's performance was not deficient. Regarding the question of prejudice, we again note that Dr. McMaster testified as an expert about the condition of the body and her opinions regarding the approximate time of the victim's death. Dr. McMaster's testimony was more specific than Agent Poltorak's in that it placed the time of death closer to the time of the victim's disappearance. The proof of the Petitioner's guilt was strong. The Petitioner failed to show that he was prejudiced by counsel's failure to object to Agent Poltorak's testimony. He is not entitled to relief on this basis.

## II

The Petitioner contends that counsel provided ineffective assistance because they failed to request an alibi instruction. The State contends that based upon this court's determination in the Petitioner's appeal of his convictions that an alibi instruction was not supported by the evidence, counsel were not ineffective in failing to request the instruction. We agree with the State.

In denying relief on this basis, the trial court stated:

The Court finds, as it did at trial, that the evidence did not support an instruction as to an alibi defense. The murder weapon was found on the defendant at the time of his arrest, and the victim was missing before the defendant was arrested. The expert testimony adduced at trial corroborated the evidence which showed that the victim died before Mr. Honea's arrest.

As this court noted in the appeal, a question of an alibi was not fairly raised at the trial. *See Henry Alfred Honea*, slip op. at 19-20. Counsel were not ineffective for failing to request the instruction. The Petitioner is not entitled to relief on this basis.

-21-

## III

The Petitioner contends that counsel provided ineffective assistance for failing to subpoena Iris Crowfoot and Barbara Lawter. The State contends that counsel determined that the witnesses' testimony would not be useful and that counsel were not ineffective. We conclude that the Petitioner is not entitled to relief.

In denying post-conviction relief, the trial court stated:

The Court finds that defense [counsel's] testimony as to their decision not to call Ms. Crowfoot and Ms. Lewter was reasonable and credible. Although Ms. Lewter is now dead, Ms. Crowfoot testified at the post-conviction hearing that she had no direct evidence as to the allegations of murder. She only knew a few hearsay matters and both witnesses' testimony would not have been beneficial to the defense.

Counsel testified that he interviewed Ms. Crowfoot and that it was his strategic decision, in consultation with the Petitioner, not to present her testimony at the trial. No evidence was presented of the substance of Ms. Lewter's potential testimony, although co-counsel testified that he had been told that neither Ms. Crowfoot nor Ms. Lewter had helpful information.

The Petitioner argues that these witnesses would have shown that someone else could have committed the murder. We will not second-guess counsel's strategic decision not to call Ms. Crowfoot after interviewing her, investigating the information she provided, and consulting with the Petitioner. Regarding Ms. Lewter, we will not speculate that her testimony, the content of which is unknown, would have benefitted the Petitioner. We note again the strong evidence of the Petitioner's guilt. We likewise note that Bill Pamplin, the victim's nephew, testified about the victim's concern that her grandson Joe may have stolen money from her and that Investigator Billy Cook testified about the Petitioner's claim he sold his gun to David Loffman, one of the victim's grandsons. The trial court did not err in concluding that the Petitioner failed to prove ineffective assistance in not presenting Ms. Crowfoot's and Ms. Lewter's testimony. The Petitioner is not entitled to relief on this basis.

## IV

The Petitioner contends that counsel provided ineffective assistance because they failed to request a mistrial when information about a pending charge was projected briefly onto a screen in the courtroom. The State contends that the Petitioner failed to show the ineffective assistance of counsel. We agree with the State.

The trial record reflects that during Investigator Cook's testimony, a document was projected that contained two lines referring to the Petitioner's pending rape charge. After an objection, the court held a jury-out hearing, after which the information was redacted and the jury was instructed to disregard any specifics of the reason the Petitioner was wanted by the police at the time he was arrested. No mistrial was requested. In his appeal, the Petitioner contended that the trial court erred in not declaring a mistrial on this basis. This court concluded that the Petitioner failed to establish the requisites for plain error relief. The court also noted that the record did not contain the document that was projected onto the screen, and we note that the document was not offered as an exhibit at the post-conviction hearing.

In denying post-conviction relief, the trial court stated:

The Court recalls this episode at the trial very well. The wrong slide was shown very briefly on the overhead, and it was taken down forthwith. The Court recalls that it believed no one on the jury had time to see it. Out of an abundance of caution, the Court gave a curative instruction, and this Court firmly believes it had no effect on the jury. In fact, the Court understands that the jury already knew the defendant was wanted on other charges when he was arrested. This was all in the proof, so a mistrial motion would have been denied if asked for.

We acknowledge, though, as does the State, that despite the trial court's finding that it believed no one on the jury saw the reference to the rape charge, the trial record reflects the court's statement during the jury-out hearing that the jury "[p]robably did" see it. It does not, however, change our view of the case. No juror testified at the hearing to show whether the jury saw the information about the Petitioner's rape charge.

Co-counsel testified that he did not think a mistrial was warranted. Counsel testified that he did not request a mistrial because he thought the judge's curative instruction adequately addressed the situation. He also said he did not want to create greater emphasis, did not know if any of the jurors saw or recognized the information, and did not want to ask them. We have reviewed the curative instruction the trial court gave. Because counsel made a considered, strategic decision not to request a mistrial and requested a curative instruction and the trial court gave an adequate instruction, the trial court did not err in determining that counsel were not ineffective. The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE